**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **HATTIE DICKERSON,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 5:08-CV-122 (CAR)** |
| | : | |
| **JAMES B. PEAKE, Secretary,** | : | |
| **Department of Veterans Affairs** | : | |
| **Agency, CARL VINSON VA** | : | |
| **MEDICAL CENTER, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

_____

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Hattie Dickerson filed two complaints raising employment discrimination claims related

to her employment at the Carl Vinson VA Medical Center. One raises claims of discrimination

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The other

raises claims of discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et

seq. ("Rehab Act"). Defendants have made a motion for summary judgment in each case.

This is Dickerson's Rehab Act case.[1] The facts supporting Dickerson's Rehab Act

claims are reasonably separable from the majority of the precipitating events for Dickerson's

Title VII claims. As a result, the factual background of this Order focuses primarily on

Dickerson's medical condition and her interactions with the Carl Vinson VA Medical Center

regarding her condition. The Court will present those facts in the light most favorable to

_____

[1]       Dickerson's Title VII claims can be found in Case No. 5:08-CV-392.

1

Dickerson in this summary judgment posture. Having carefully considered the matter, the Court finds that Dickerson has failed to establish her claims under the Rehab Act because the evidence shows that she is not a qualified individual with a disability. Accordingly, Defendants' Motion for Summary Judgment [Doc. 50] is **GRANTED**.

## I. FACTUAL BACKGROUND

Dickerson was hired as a staff nurse on December 21, 1997, at the Carl Vinson Veterans Affairs Medical Center in Dublin, Georgia ("the VA"). By all accounts, she was an excellent nurse and worked without incident until 2004.

Dickerson's medical troubles began in 2004.[2] In April 2004, Dickerson suffered a mild allergic reaction while working on Ward 19A. On July 24, 2004, Dickerson suffered her first severe allergic reaction while working on Ward 19A. It was first suspected that the reaction was the result of an insect bite. A few days later, however, Dr. Rahul Vangala noted that her symptoms had occurred before in the work environment and suggested that Dickerson be tested for an allergy to latex gloves.

In August 2004, Dickerson returned to work on Ward 19A.[3] Two days after returning to work, she suffered a mild recurrence of her allergic reaction. Then, on September 14, 2004, Dickerson suffered another severe reaction on Ward 19A. At that time, the suspected allergen was either blue latex gloves or the special chemotherapy gloves that Dickerson was using.

---

[2] As set out in Case No. 5:08-CV-392, the events that form the basis of several of Dickerson's Title VII claims happened around this time as well.

[3] Throughout this narrative of events, the Court will often refer to Dickerson returning to work some indeterminate period of time after a reaction. During her deposition, Dickerson was usually unable to provide a definitive statement as to how much time she missed after each reaction. Instead, her story usually moved directly on to the next reaction or employment related event. Thus, the Factual Background proceeds in the same fashion.

In October 2004, Dickerson returned to work. Her physician Dr. Al-Shroof requested that she be placed somewhere other than Ward 19A. Dickerson met with Kersey regarding this request, and Kersey suggested she be temporarily assigned to either Ward 10A or 12A. Dickerson chose a temporary assignment to Ward 10A. After being reassigned, Dickerson suffered some residual effects from her prior allergic reactions while on Ward 10A. Then, on October 29, 2004, Dickerson suffered another allergic reaction. Dickerson stayed home for approximately five days before returning to work on Ward 10A.

After returning to work, Dickerson requested a permanent transfer to Ward 10A[4]. Kersey refused that request, and on December 10, 2004, she reassigned Dickerson to Ward 19A based on staffing needs. On December 26, 2004, Dickerson suffered another allergic reaction. As a result, she missed several days of work in January. After again returning to work, Dickerson suffered another acute allergic reaction on February 3, 2005.

On February 10, 2005, Dr. Al-Shroof wrote a letter requesting that Dickerson not be made to work on any ward where she had suffered a previous reaction. When Dickerson returned to work on February 21, 2005, however, she was again placed on Ward 19A. That same day she suffered another acute allergic reaction.

On February 22, 2005, Dr. Mokhtar Hacena wrote a letter stating that Dickerson was experiencing allergic reactions to her workplace, that the reactions did not occur at home or elsewhere, and that submitting Dickerson to a provocation test to identify a specific allergen was too dangerous. Dr. Hacena recommended that Dickerson be relocated to a unit where she had not suffered any previous allergic reaction because further exposure would likely result in more

---

[4]     She made this request even though she admittedly suffered an acute reaction on Ward 10A.

serious reactions. In spite of the letter, Dickerson was not moved until she sought assistance from the internal EEO office. Dickerson was eventually moved to Ward 12A.

By April 2004, the VA had acknowledged that Dickerson was sensitive to the chemicals used in the floor waxing process. When the VA started applying waxing chemical to the floors on her ward, Dickerson requested to be moved to another location during that time. Her superiors did not approve that request, even though an African-American nurse that experienced reactions during floor waxing was moved during such times. After Dickerson again went to the internal EEO office, Kersey agreed to move Dickerson to Ward 19B to do clerical work during the application of the floor wax in April.

On June 2, 2005, Dr. Hacena diagnosed Dickerson with occupational asthma. In June, floor wax was applied to Ward 12A. On June 17, 2005, Dickerson suffered another acute allergic reaction.

When Dickerson returned to work after that episode, her supervisors assigned her to an office outside the surgical clinic where she was responsible for patient admissions, patient education, and assisting doctors in various procedures. The floors in the office were not carpeted, but there was no wax on them. Dickerson suffered no allergic reactions while working in that office. She did, however, experience allergic symptoms while walking through the front door of the facility, which required her to walk across a waxed floor, and while using the bathroom. To remedy these problems, Dickerson found an entrance that did not require her to cross a waxed floor in order to get to the office and another bathroom that did not trigger any symptoms.

On July 1, 2005, Dickerson, acting on instructions from the EEO office, submitted a request for a reasonable long-term accommodation to Preston. Dickerson maintained that there

were areas of the hospital where she could work. She identified three vacant positions: 1) the surgical ward – because not all rooms in this position were carpeted, she suggested that the rooms be carpeted; 2) the psychiatric ward, which was carpeted; and 3) ambulatory care, which was carpeted. On July 8, 2005, Dickerson submitted a report of her history of allergic reactions in support of her request.

On July 20, 2005, Lindsey issued to a memorandum to Dickerson regarding her request for accommodation. Lindsey stated that Nursing Service Management had been accommodating Dickerson since July 2004 by moving her to other wards in an attempt to find a workplace where she would not suffer a reaction. Lindsey noted that in order to determine whether Nursing Service Management could continue to accommodate her, Dickerson needed to provide documentation from her physician specifically identifying her restrictions or limitations and specifically identifying the substance suspected of causing her allergic reactions. Lindsey further noted that in the event Nursing Service Management was unable to accommodate Dickerson, it might become necessary to evaluate her fitness for continued employment. Lindsey also forwarded a form outlining the necessary standards for medical documentation to Dickerson.

On August 1, 2005, Dr. Hacena wrote a letter regarding the cause of Dickerson's reactions. He noted that it would be dangerous to submit Dickerson to a provocation test. He also noted that Dickerson needed to see a doctor specializing in occupational medicine to determine the specific allergen because by the time he saw Dickerson after episodes, she had already been medicated by emergency room physicians. He concluded that he could not rule out

or confirm an occupational etiology[5] for her symptoms and requested that she not be exposed to any aggravating factor until a further workup was completed.

On August 2, 2005, Dr. Al-Shroof also wrote a letter regarding Dickerson's condition. He noted that she had experienced reoccurring problems with elevated blood pressure and allergic reactions to a floor wax in the VA hospital. He stated that an accurate estimate of the time the condition would persist was unavailable due to continued exposure to the allergen. He concluded by requesting that Dickerson be removed from the presence of the wax and placed in an environment where exposure was less likely to occur.

On August 18, 2005, Preston issued a memorandum addressing Dickerson's medical documentation. Preston stated that after reviewing the documentation from Dr. Al-Shroof, she determined that Nursing Service could not accommodate Dickerson in her present position. She noted that Dr. Al-Shroof had identified floor wax as the cause of Dickerson's condition, and that floor wax was used on all clinical areas in the VA. Thus, if Dickerson were to be accommodated it would have to be outside of the clinical areas and Nursing Service.

Soon after Preston issued her memorandum, Dickerson was reassigned from the surgical clinic to the nursing education office. In discussing this reassignment, Forrest asked Dickerson whether she needed to avoid the waxing process or any unit with a waxed floor because the VA's initial interpretation when it assigned her to the Surgical Clinic was that she needed to avoid the waxing process. Specifically, Forrest questioned whether Dickerson needed to avoid a floor "being waxed, newly waxed or a waxed floor peroid." Dickerson responsed, "unfortunately no, it refers to any area with a waxed floor." According to Dickerson, in addition

---

[5]    Etiology refers to the cause or origin of a condition.

to clerical-type duties, her duties in the nursing education office included teaching and certifying other nurses, evaluating ways to make the VA safer, and communicating with other VA hospitals to improve different systems while in that position. Dickerson suffered no allergic reactions while working in the nursing education office because it was carpeted at that time, and she was able to access the office through the back door, avoiding any waxed areas.

On September 6, 2005, Preston issued another memorandum. In this memorandum, she stated that Dickerson had not provided sufficient documentation of her condition to demonstrate a need for a reasonable accommodation. She noted that the VA was only required to make a reasonable accommodation for an employee that was a "qualified individual with a disability" as defined by 29 C.F.R. 1614.023, and that Dickerson's medical documentation was not sufficient to allow the VA to determine whether she was a qualified individual with a disability. She then laid out the information necessary to make that determination: 1) a detailed description of her medical condition and the medical basis for that finding; 2) clinical findings from her most recent medical evaluation; 3) a prognosis, including plans for future treatment and an estimate of the expected date of full or partial recovery; 4) an explanation of the impact of the stated medical condition on overall health and activities, including the basis for any conclusion that restrictions or accommodations are or are not warranted, and, if so, where they are warranted and an explanation of their therapeutic value; and 5) a detailed explanation of the specific duties of her current position that she was unable to perform as a result of her disability.

On September 21, 2005, Dr. Al-Shroof produced another letter to respond to the previous memorandum. In that letter, he listed Dickerson's diagnosed symptoms or conditions: 1) allergic response, 2) urticaria, 3) contact dermatitis/eczema, 4) shortness of breath, 5) pruitis/extensive rash, 6) hypertension, 7) angioedema, 8) bronchospasm, and 9) asthma/occupational. He linked

the conditions to frequent exposure to environmental chemical/stimuli as evidenced by Dickerson's treatment immediately after exposure to sprays/cleaning products used in waxing the floors of Ward 12A on June 17, 2005. Regarding Dickerson's prognosis, he stated that her prognosis was fair to good if she avoided environmental chemical/stimuli such as chemical products, wax, sprays, and cleaning products used in the VA. He stated, however, that continued exposure to those stimuli might result in anaphylactic shock. He requested a reasonable long-term accommodation for Dickerson, but noted that the VA was in the best position to know which jobs were vacant or would become vacant within a reasonable time. In regards to limitations, he noted that Dickerson was generally able to perform her duties, but that exposure to the previously listed stimuli would result in the need for emergency medical treatment that would prevent her from performing her duties.

On October 3, 2005, Preston issued yet another memorandum in response to Dr. Al-Shroof's letter. In that memorandum, she stated that Dickerson's medical documentation was still not sufficient to allow the VA to determine whether she was a qualified individual with a disability because the documentation did not make clear exactly what environmental chemical/stimuli caused Dickerson's allergic responses. Preston reminded Dickerson that she bore the responsibility of providing the necessary documentation and extended another opportunity to provide the necessary documentation. Preston also noted that Dickerson would remain detailed to administrative duties in the Nursing Office, but reiterated that permanent reassignment there was not an option because it was not an actual funded position.

Preston's October 3 memorandum apparently lead to a conversation between a VA physician and Dr. Al-Shroof, and on October 31, 2005, Preston issued another memorandum setting forth the VA's conclusions in light of that conversation. Preston stated that based on

Dickerson's medical documentation and the follow-up consultation with Dr. Al-Shroof, the VA was still unable to determine that Dickerson was a qualified individual with a disability because Dr. Al-Shroof was unable to verify that the symptoms of Dickerson's medical condition, identified as asthma, were made worse by performing her current duties. As a result, Preston reassigned Dickerson back to Ward 12A effective November 2, 2005. Preston noted that the VA was reassigning Dickerson in an attempt to determine what, if any, essential job functions her condition prevented her from performing. In light of that goal, Preston directed Dickerson to report to an Employee Health Physician before her shift for a pulmonary function test.

Rather than reporting to work on November 2, Dickerson made another appointment with Dr. Hacena. At the conclusion of that visit, Dr. Hacena provided Dickerson with a note stating that he believed Dickerson should not be reassigned to her previous wards until it could be determined that she did not suffer from occupational asthma. He also reiterated his recommendation that Dickerson see occupational medicine.

On November 3, 2005, Dickerson took Dr. Hacena's note to Human Resources. When Dickerson met with Human Resources, Lindsey, Forrest, Preston, and OWCP[6] Specialist Hampton were present. Dickerson contends that they told her that they did not believe her doctors' conclusion that her condition was related to her work environment, that they were not going to accommodate her, and that if she did not return to the ward, she would lose her job.

After leaving that meeting, Dickerson made her way to the intensive care unit so that she could undergo the pulmonary function test required by Preston's October 31 memo. Her path to

[6] Although the Court was unable to locate any instance in the briefs where the parties specify what the acronym OWCP stands for, the Court's independent research indicates that it is the Office of Workers' Compensation Programs. In any event, it is clear from the record that OWCP deals with Workers' Compensation claims within the VA.

the intensive care unit took her down Ward 9A, which is a long, waxed hallway. While traversing that hallway, Dickerson suffered another acute allergic reaction. Dickerson sought treatment in the VA's emergency department. She was there from 8:00 a.m. until 3:00 p.m., and was given a number of medications. After she was discharged from the VA emergency department, Dickerson drove herself to Fairview Park Hospital, where she received further treatment.

On November 7, 2005, Dickerson returned to the VA for a meeting with Preston, Forrest, Hampton, and Lindsey. In that meeting, Dickerson stated that she wanted to return to work, but asked that the VA accommodate her instead of placing her in a life threatening situation by forcing her to work on the wards. No accommodation was forthcoming at that meeting, and Dickerson was told to return to work. Dickerson chose not to return to work. In doing so, however, she also chose not to request leave for her absence.

On December 9, 2005, Acting Associate Director for Patient/Nursing Service Sarah Williams sent Dickerson a letter informing her that she had been placed on Absent-Without-Leave ("AWOL") status effective November 7, 2005. The letter noted that since the previous meeting, Dickerson had not returned to work, provided medical documentation for her absence, or contacted anyone in a supervisory position to request leave. The letter ordered Dickerson to return to work immediately or to contact Kersey or Forrest to request leave for her absence. The letter also warned that unless Dickerson provided documentation verifying her incapacitation for duty or other reason for her absence, she might be subject to discipline. After receiving that letter, Dickerson resubmitted all previously submitted medical documentation and a letter from Dr. Al-Shroof stating that medical leave should continue until further notice per his memo dated August 2, 2005.

After receiving that information, Hampton submitted a letter of inquiry to the Department of Labor dated December 20, 2005. In his letter, Hampton requested that the Department of Labor advise the VA as to whether: 1) There was a comprehensive, objective medical rationale for Dickerson's assertion that she experienced "anaphylactic reactions" when entering any area of the VA Medical Center except the "light duty" office she had been assigned to; 2) There was an actual diagnosis supported by well rationalized medical opinion and documented by factual, quantifiable tests; 3) The physician's restriction against returning to work at the VA was valid under the Federal Employees' Compensation Act ("FECA") and OWCP; and 4) There was medical information on file that prevented the VA from returning Dickerson to her DOI[7] position. Along with summarizing Dickerson's condition, previous claims, and the note from Dr. Al-Shroof, which he described as retroactively putting Dickerson off duty from August 2005, Hampton noted that Dickerson's claims had been single episodes and that in the absence of a medical diagnosis to support ongoing disease or disability, the VA proposed to remove Dickerson from the sedentary, administrative position she had occupied and return her to active duty as an RN. He also noted that Dickerson had completed one pulmonary function test, the results of which were normal, and had failed to comply with efforts to schedule more testing. When questioned regarding this letter during his deposition, Hampton conceded that he had medical documentation showing Dickerson suffered from occupational asthma and that the cause of her allergic reactions was the floor wax, but that he thought the doctors' evaluations were incorrect.[8]

---

[7] The Court can find no indication in the record or the briefs as to what DOI means.

[8] The record does not show whether Hampton received a response to this letter from the Department of Labor.

On February 1, 2006, Kersey sent Dickerson a notice of proposed reprimand. Dickerson was charged with unauthorized absence from November 7, 2005 to December 16, 2005, and deliberate refusal to report to a duty assignment based on the following incident. On December 16, 2005, Dickerson was ordered to report for a pulmonary function test. After completing the test, she was supposed to report to work on Ward 13B and then return for another test at the end of her shift. Instead, she called Forrest and told her that she would not be able to report the VA until December 19, 2005. On December 19, 2005, Dickerson reported for her pulmonary function test, but after completing the test, she told Kersey she was not reporting to Ward 13B as ordered and left the VA. On February 22, 2006, after receiving Dickerson's response, Kersey entered an official reprimand for unauthorized absence. After Dickerson filed a grievance on the matter, the reprimand and proposed 10-day suspension were withdrawn.

On February 23, 2006, Dr. Susan Tanner of the Progressive Medical Center in Atlanta wrote a letter concerning Dickerson's condition based on an assessment she performed on December 27, 2005. In it, Dr. Tanner diagnosed Dickerson as suffering from multiple chemical sensitivity. Dr. Tanner described multiple chemical sensitivity as a complex disorder in which a patient with a genetic predisposition to hypersensitivity reactions begins to suffer a variety of physical manifestations after being exposed to a threshold level of environmental compounds. She noted that over time, the physical manifestations may change, the number of chemicals may increase, and the disorder may become more difficult to control. In regards to Dickerson, Dr. Tanner noted that Dickerson had reported a correlation between her episodes and floor waxing chemicals, but that she had become progressively more sensitive to scents and odors, fumes of any kind, and latex. Dr. Tanner concluded that Dickerson could only live and work in environments that were rigidly controlled as far as exposure to volatile compounds, odors, and

molds, and that Dickerson could only resume work in the VA if those restrictions were accommodated.

On April 3, 2006, Dr. Herbetta Pearson, a doctor at the Robins Air Force Base, also wrote a letter regarding Dickerson's condition. In it, Dr. Pearson noted that she was treating Dickerson for multiple chemical sensitivity, the symptoms of which were thought to be secondary to a workplace allergen. She recommended that Dickerson work in an environment in which she would not be exposed to chemicals that caused that reaction because during a reaction Dickerson would be unable to concentrate or deliver patient care.

On June 27, 2006, Dr. Tanner composed another letter regarding Dickerson's condition. Based on Dickerson's history, Dr. Tanner again diagnosed Dickerson as suffering from multiple chemical sensitivity, which she described as a permanent, chronic, and recurring disease in which individuals exposed to chemicals can suffer neurological, immune, respiratory, skin, gastrointestinal, and musculoskeletal symptoms. She attributed Dickerson's reaction to exposure to chemicals/solvents in the work environment. Dr. Tanner opined that the increased severity of Dickerson's allergic reactions demonstrated that she might suffer an anaphylactic reaction from continued exposure to allergens in the work environment. Dr. Tanner then presented a host of complications that could arise both from Dickerson's reactions and the medication necessary to treat them. Her bottom line conclusion was that during a reaction or when under medication for one, Dickerson would not be able to concentrate, react to an emergency crisis, make clinical judgments, deliver patient care, administer medications, or even necessarily walk. As in her earlier letter, Dr. Tanner stated that Dickerson could only work in an environment that was rigidly controlled as to volatile compounds, molds, asbestos, and chemical solvents because continued exposure would only worsen her reactivity to such substances.

13

On July 12, 2006, Lindsey issued yet another memorandum requesting more information regarding Dickerson's medical condition and restrictions. She noted again that the medical information provided by Dickerson was still insufficient to determine whether she was a qualified individual with a disability and what, if any, reasonable accommodation was possible. She characterized the medical information as indicating that Dickerson's reactions were triggered by chemicals at the medical center without identifying the particular chemical agents causing the issue. According to Lindsey, that information was not sufficient to allow the VA to evaluate Dickerson's restrictions and possible accommodations because the VA used a variety of chemical agents throughout the hospital. Lindsey stated that without an identification of the actual agents causing Dickerson's reactions, it was impossible to determine where she could be placed in order to avoid further health problems. In light of that problem, she asked for further information in regards to the particular chemicals that may have been causing Dickerson's reactions in order for the VA to determine whether there was an accommodation that would allow Dickerson to return to work and perform the essential functions of her job. Lindsey concluded by informing Dickerson that if more definitive information were not forthcoming, the VA would assume Dickerson could only work in a chemical free environment and would determine whether a fully-funded vacancy existed in such a position. If such a position did not exist, the VA would begin the process of separating Dickerson from employment.

On October 23, 2006, and December 1, 2006, Dr. Tanner issued two more letters targeted to the VA's requests. Dr. Tanner linked Dickerson's reactions to floor stripping and cleaning solutions and solvents used in the environment. She listed a number of specific compounds found in professional cleaning products and stated that any one of those compounds was more likely than not to trigger an allergic response. She also noted that commonly used chemicals in

14

the hospital environment such as rubbing alcohol, floor wax, and ammonia would more likely than not trigger an allergic response. She explained that any of the chemical identified that Dickerson had been exposed to in the past were now, and always would be, an allergen for Dickerson. She concluded that Dickerson could not come within less than a foot of any of those chemicals or solvents.

On January 9, 2007, Preston issued a notice of proposed action to remove Dickerson from her employment because of a medical inability to perform the job of Staff Nurse. On February 15, 2007, Acting Medical Center Director Kelly Duke issued a removal decision terminating Dickerson from her position as a Staff Nurse effective February 8, 2007, based on a medical inability to perform the job of Staff Nurse.

## II. LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment must be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986 ). A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986). Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52, 106 S. Ct. at 2511-12. When ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553 (internal quotation marks omitted). If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact. See Fed. R. Civ. P. 56(e); see also Celotex Corp., 477 U.S. at 324-26. This evidence must consist of more than mere conclusory allegations or legal conclusions. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).

## III. REHABILITATION ACT

The Rehabilitation Act prohibits federal agencies from discriminating in employment against individuals with disabilities. Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005). "The standard for determining liability under the Rehabilitation Act is the same as that under the ADA." Sutton v. Lader, 185 F.3d 1203, 1207 n.5 (11th Cir. 1999); see 29 U.S.C. § 791(g). Under the Rehab Act (by way of the ADA), covered entities are prohibited from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Such discrimination includes an employer's refusal to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the

business of such covered entity." Id. § 12112(b)(5)(A). A "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). "To establish a prima facie case of discrimination under the Rehabilitation Act, [a plaintiff] has the burden of showing that (1) she had a disability; (2) she was otherwise qualified for the position; and (3) she was subjected to unlawful discrimination as the result of her disability." Garrett v. Univ. of Ala. at Birmingham Bd. of Trustees, 507 F.3d 1306, 1310 (11th Cir. 2007).

A.    Whether Plaintiff Has A Disability

The Court finds that Defendants have conceded any argument as to whether Dickerson suffers from a disability as defined by the Rehab Act. Certain statements in some of the earlier memoranda that the VA exchanged with Dickerson could be read as questioning whether Dickerson was disabled at all. Defendants' brief in support of the motion for summary judgment takes no clear stance on the issue, but is best read as focusing on the question of whether a reasonable accommodation existed. Any doubt on whether Defendants intend to contest the question, however, is removed by the reply brief, which concedes the issue. In the reply brief, Defendants state: "The ultimate issue in this case is whether or not the Plaintiff is a Qualified Individual with a Disability." [Doc. 69 at 2]. Defendants then go on to concede that Dickerson "by all indications is none the less suffering from a disability." [Id. at 5]. Given Defendants' concession that Dickerson suffers from a disability, the Court accepts the same and will proceed to determine whether Dickerson is otherwise qualified for the her position or, stated in terms of the ADA, a qualified individual with a disability.

B.    Whether Plaintiff Was Otherwise Qualified for the Position

Courts employ a two step process to determine whether an individual is qualified for a

job. "First, does the individual satisfy the prerequisites for the position; does the individual have sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job? Second, can the individual perform the essential functions of the job, either with or without reasonable accommodations?" Reed v. Heil Co., 206 F.3d 1055, 1062 (11th Cir. 2000)(citation omitted); see also Sutton, 185 F.3d at 1210 ("In the employment context, an otherwise qualified person is one who can perform the essential functions of the job in question with or without reasonable accommodation." (internal quotation marks omitted)).

In this case, there is no debate on the first inquiry. The parties agree that Dickerson possessed the requisite experience, skills, educational background, and licenses to work as a Staff Nurse at the VA.

The key issue then is whether Dickerson can perform the essential functions of the job of Staff Nurse, either with or without reasonable accommodation. "An accommodation can qualify as 'reasonable,' and thus be required by the ADA, only if it enables the employee to perform the essential functions of the job." Lucas, 257 F.3d at 1255. Reasonable accommodations may include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities" or "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). The burden of identifying an accommodation and demonstrating that the accommodation allows her to perform the job's essential functions lies with the plaintiff. Lucas, 257 F.3d at 1255-56. "A plaintiff does not satisfy her initial burden by simply naming a preferred accommodation-even one mentioned in the statute or regulations;

18

she must show that the accommodation is 'reasonable' given her situation." Terrell v. USAir, 132 F.3d 621, 626 (11th Cir. 1998). Reasonable accommodations do not include assigning a worker to a position for which she is not qualified or creating a position specifically for the disabled worker. Sutton, 105 F.3d at 1211.

Defendants contend that Dickerson has failed to produce sufficient evidence to create a triable question on the issue of whether she was a qualified individual with a disability. Defendants argue that the evidence shows that Dickerson could not perform the essential functions of the job of Staff Nurse even if she were assigned to other positions she suggested as reasonable accommodations.

Dickerson, on the other hand, contends that she was a qualified individual because she could perform the essential duties of a Staff Nurse with the reasonable accommodation of being assigned to an area with carpeted floors or floors that were not waxed. In a July 2005 letter to the VA, Dickerson identified three areas that she believed met these limitations: 1) the Psychiatry Department, 2) the Operation Room, and 3) Ambulatory Care.

There appears to be no dispute over whether Dickerson's reactions rendered her unable to perform the essential functions of a Staff Nurse. Her reactions caused various physical manifestations that forced her to leave the workplace and often miss substantial periods of time before returning to work. In her June 27, 2006 letter, Dr. Tanner concluded that during a reaction or when under medication for one, Dickerson would not be able to concentrate, react to an emergency crisis, make clinical judgments, deliver patient care, administer medications, or even necessarily walk. [Pl. Ex. 57].

Thus the question becomes whether Dickerson has identified any position that the VA could assign her to in which she could escape the possibility of suffering these debilitating

reactions. That question is best broken into two sub-inquiries: 1) what environmental conditions did Dickerson need to avoid, or put differently, what were the triggers for her reactions and 2) did Dickerson identify a position that it would have been reasonable for the VA to assign her to that would have allowed her to avoid those triggers.

Although Dickerson tries to limit the answer to the first question to exposure to floor wax, the evidence paints a dynamic and eventually broader picture. Dickerson's earliest allergic responses were attributed to a possible sensitivity to latex gloves. [Pl. Exs. 12, 13]. In a February 2005 letter, Dr. Al-Shroof recommended that Dickerson avoid work in areas where she had previously experienced reactions, but did not evaluate any allergen at that time. [Pl. Ex. 20]. Dr. Jay Moparthy, who treated Dickerson after her February 21, 2005 reaction was also unable to pinpoint a source, noting: "Allergic reaction to unknown substance or medications she may be handling." [Pl. Ex. 21]. And on February 22, 2005, Dr. Hacena posited that Dickerson's reactions were work related because she did not suffer them outside of work, but noted there was no way of establishing the causal agent because provocation tests would be dangerous. By the end of February 2005, the evidence indicated a likely workplace allergen, but not any specific allergens. This evidence is insufficient to answer the first question of what triggered Dickerson's reactions and thus what her medical limitations were. Without an answer to that question, there is no basis for evaluating positions in which she could perform the essential functions of her job.

When Dickerson began requesting reassignment off the wards in earnest, more specific theories for her issues developed. In a July 2005 letter, Dickerson noted that she had experienced problems on multiple wards when exposed to: the process of stripping, waxing, and sealing the floors, chemicals from paint, and lemon scent added to chemicals/water when

cleaning beds and other areas. [Pl. Ex. 27]. She noted that wearing a mask during the floor stripping process did not prevent her from developing serious symptoms. [Id.]. On August 2, 2005, Dr. Al-Shroof wrote in a letter that Dickerson's problems were the result of allergic reactions to a certain floor wax in the VA. [Pl. Ex. 30]. In a September 21, 2005 letter, Dr. Al-Shroof stated that Dickerson's reactions followed "[f]requent exposure to environmental/chemical stimuli as stated in Dr. Jay Moparthy's note, a physician who treated patient immediately after being exposed to sprays/cleaning products, waxing on the floors." [Pl. Ex. 34]. He went on to state that her prognosis was good if she avoided "environmental chemical/stimuli . . . such as chemical products, wax, []sprays, [and] cleaning products used" in the VA, but that she would be unable to perform her job if exposed to those stimuli. [Id.].

In short, the evidence as of September 2005 begins to paint a clearer picture of the situation. By this time, doctors had begun to classify Dickerson as suffering from allergic reactions. The notes also show that based on their interactions with Dickerson they believed that workplace factors, including floor wax, were triggering the reactions. Other contemporaneous evidence also demonstrates that the VA was aware that, at the least, Dickerson suffered a sensitivity to floor wax. For instance, in an April 8 email Sylvia Kersey noted that Dickerson was experiencing problems with the floor stripping. [Pl. Ex. 24]. In addition, on August 18, 2005, after receiving Dr. Al-Shroof's August 2 note, Preston wrote that Dickerson could not be accommodated in Nursing Service because all clinical areas of the hospital used floor wax. [Pl. Ex. 31].

Considering that medical documentation and other contemporaneous evidence, Dickerson's frustration at the VA's requests for more information is understandable. She argues that she had identified floor wax as the cause of her problems and proposed several job

assignments that would not bring her into contact with floor wax. At the time, the VA stated that no job in Nursing Service could avoid floor wax, but Dickerson disagrees with that assessment and contends she has created a genuine issue of material fact as to that question.

Unfortunately for Dickerson, that synopsis of the situation does not take into account all of the evidence produced to that point. There appears to be little question that by September 2005, Dickerson was, at the least, sensitive to the floor wax in the VA. But even at that time, the evidence did not limit her sensitivity to floor wax alone. Although Dr. Al-Shroof's August 2 letter listed floor wax as the trigger for Dickerson's reaction, by September 21, he had expanded his list of triggering allergens to "environmental chemical/stimuli . . . such as chemical products, wax, []sprays, [and] cleaning products used" in the VA. Furthermore, Dickerson stated in her July 2005 letter that she had experienced problems not just with the floor waxing process, but also with chemicals from paint, and lemon scent added to chemicals/water when cleaning beds and other areas.

When measured against the total body of evidence developed at that point, the necessity of the VA's requests for further information becomes clear. At this point, the VA was faced with a situation where an employee could not perform the essential functions of her job if she came into contact with not only floor wax, but also many other substances that might fall under her doctor's non-specific designation of "chemical products" or "cleaning products" used in the hospital. Simply assigning Dickerson to a position where she would not come into contact with floor wax (accepting her contention that the positions she identified would satisfy that limitation) would not guarantee that she would be able to perform the essential functions of her job if other "chemical products" or "cleaning products" used in those areas might still trigger a reaction. In that situation, the need for more detailed medical information becomes apparent.

Faced with those requests, Dickerson came forth with more specific information. Unfortunately, that medical documentation was not consonant with her theory that exposure to floor wax was her only limitation and that she only needed to identify positions that avoided floor wax. After she was placed on AWOL status and threatened with a reprimand for failing to report to duty, Dickerson came forth with medical evidence produced by Dr. Tanner. In her February 23, 2006 letter, Dr. Tanner posited that Dickerson suffered from multiple chemical sensitivity. [Pl. Ex. 51]. The letter noted that Dickerson had observed a correlation between her symptoms and the floor waxing process, but it went on to state that Dickerson had "become progressively more sensitive to scents and odors, fumes of any kind, and to latex." [Id.]. Dr. Tanner concluded that Dickerson could only "work in environments that are rigidly controlled as far as exposure to any volatile compounds, odors, and molds" and that Dickerson could only resume her work in the VA if those accommodations were met. [Id.]. Dr. Tanner's June 2006 letter reiterated those limitations and further stated that Dickerson could not be exposed to "chemical solvents." [Pl. Ex. 57]. Dr. Tanner expanded further in an October 23 letter by listing various chemicals commonly found in professional cleaning products that would "more likely than not" trigger an allergic response. [Pl. Ex. 59]. Dr. Tanner went on to state that several chemicals commonly used in the hospital environment, including rubbing alcohol, floor wax, and ammonia would more likely than not trigger an allergic response. [Id.]. Dr. Tanner concluded that Dickerson could not come within one foot of any of the chemicals listed in her previous letters. [Id.].

To sum up, the state of the medical evidence at the time Dickerson was placed on AWOL status and eventually fired was as follows. Dickerson was suffering from multiple chemical sensitivity, which caused reactions that rendered her unable to perform the essential functions of

the Staff Nurse job. She was undoubtedly sensitive to the floor wax and the floor waxing process at the VA. Beyond that, her condition also left her sensitive to chemical products, cleaning products, chemical solvents, scents and odors, fumes of any kind, volatile compounds, molds, rubbing alcohol, and ammonia. Based on the medical evidence, it was more likely than not that exposure to any of those substances would trigger a reaction that would render Dickerson unable to perform the essential functions of the Staff Nurse position.

That being the case, the burden falls on Dickerson to identify a position to which the VA could reasonably assign her in which she could perform all the essential functions of a Staff Nurse without coming into contact with any of these substances that would trigger a reaction and leave her unable to perform her duties. This Dickerson did not do. Early in the process, Dickerson identified three positions in which she believed she could avoid floor wax and still perform the essential functions of the position. The VA disagreed with that contention, but Dickerson testified at her deposition that each of those positions was either in a carpeted area, a partially carpeted area that could be fully carpeted, or an uncarpeted area without floor wax.[9] Unfortunately, measured against the total body of her medical evidence as related to her limitations, her suggestions fall short. There is no evidence in the record that if Dickerson were assigned to any of those positions she would be able to perform the essential functions of a Staff Nurse in that area without coming within one foot of: floor wax (including any of its constituent substances), chemical products, cleaning products, chemical solvents, scents and odors, fumes of

_____

[9]    The Court notes that although Dickerson did not suggest assignment to the Nursing Education Office as a reasonable accommodation at that time, that position would not have qualified as a reasonable accommodation because the uncontroverted evidence shows that at the time, it was an unfunded position that Dickerson had been temporarily detailed to while the VA evaluated her situation.

any kind, volatile compounds, molds, rubbing alcohol, and ammonia.

In order to enjoy the protections of the Rehab Act, the burden is on Dickerson to demonstrate that she is otherwise qualified or a qualified individual with a disability. That burden requires her to show that she can perform the essential functions of the job with or without a reasonable accommodation. The evidence is clear that when she suffers from a reaction, she cannot perform the essential functions of a Staff Nurse. Furthermore, she has failed to identify a position that the VA could assign her to in which she could perform the essential functions of a Staff Nurse and avoid exposure to the substantial list of substances that would trigger a reaction. That being the case, Dickerson has failed to establish that she is otherwise qualified. Accordingly, she is not entitled to the protections of the Rehab Act. Summary judgment must be granted in favor of Defendants on Dickerson's Rehab Act claims.

Dickerson's situation is both unusual and lamentable. In the normal case, an employee's limitations are much clearer. An individual can't lift more than fifty pounds because of a back condition. Or an individual can't drive because of an eye condition. The limitation and its cause are distinct and static. Here, Dickerson is limited by her sensitivity to an indeterminate and, by all appearances, growing list of substances. Nonetheless, her limitations must be evaluated against the total body of medical evidence, not just her preferred subset of substances to which she is sensitive. Once that analysis is employed, it becomes clear that Dickerson has not identified any position where she could avoid these substances and still perform the essential functions of a Staff Nurse.

## IV. CONCLUSION

Having evaluated Dickerson's limitations in light of the entirety of the medical evidence, the Court finds that Dickerson has failed to come forward with any reasonable accommodation

that would allow her to perform the essential functions of the Staff Nurse position.  Accordingly, Defendants' Motion for Summary Judgment [Doc. 50] is **GRANTED**.

## V. INSTRUCTION REGARDING FURTHER PROCEEDINGS

When this case was filed, Dickerson was proceeding pro se.  In light of the factual and legal complexity presented by the case, the Court appointed Frances Clay to act as counsel for Dickerson in this matter.  Ms. Clay admirably discharged that duty.  She conducted thorough discovery and motions practice, clarified the legal issues presented, and responded to Defendants' Motion for Summary Judgment.

As set forth in this Order, the Court has granted Defendants' Motion for Summary Judgment.  The Court's initial concerns regarding the complexity of the case having been addressed by Ms. Clay's efforts, the Court finds that court-appointed counsel for Dickerson is no longer required in this case.  Thus, the Court terminates Frances Clay's appointment to this case.

At this point, if Dickerson wishes to litigate this matter further she has several options regarding counsel.  She may retain Ms. Clay under an agreement reached between Ms. Clay and Dickerson.  She may retain other counsel.  Or she may choose to represent herself.  To be clear though, Ms. Clay's obligation to further represent Dickerson by way of court appointment in this case is concluded.

In light of the Court's ruling in this Order, two options remain open to Dickerson if she desires to pursue this case further: she may file a motion for reconsideration with this Court or file a notice of appeal and prosecute that appeal in the Eleventh Circuit.  If Dickerson wishes to file a motion for reconsideration, it must be filed with the Clerk of the court within fourteen (14) days after the entry of judgment.  M.D. Ga. L.R. 7.6.  If Dickerson wishes to appeal this decision to the Eleventh Circuit, she must file a notice of appeal within sixty (60) days after the entry of

judgment.  Fed. R. App. P. 4(a)(1)(B) (60 days for notice of appeal when the United States or its officer or agency is a party).  In addition to a notice of appeal, Dickerson will be required to pay a $455 filing fee.  If she is unable to pay the filing fee, she may file a motion to proceed in forma pauperis on appeal.

The Court directs the Clerk's office to provide Dickerson with a copy of the Pro Se Litigants Guide.  Dickerson may consult the Guide for further explanation of her duties should she wish to pursue an appeal in this case.  A copy of the form required to proceed in forma pauperis on appeal can also be found in the Guide.

SO ORDERED this 31st day of March, 2011.

S/ C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

bcw